CAUSE NO. 471-02242-2020

| | | |
|---|---|---|
| **J. C. PENNEY CORPORATION, INC.,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | **COLLIN COUNTY, TEXAS** |
| | § | |
| **SEPHORA USA, INC.,** | § | |
| | § | |
| **Defendant.** | § | **_____ JUDICIAL DISTRICT** |

## PLAINTIFF'S VERIFIED ORIGINAL PETITION AND APPLICATIONS FOR DECLARATORY JUDGMENT, TEMPORARY RESTRAINING ORDER AND TEMPORARY INJUNCTION

TO THE HONORABLE COURT:

Plaintiff J. C. Penney Corporation, Inc. ("Plaintiff" or "JCP") files this Verified Original Petition and Applications seeking a Declaratory Judgment, Temporary Restraining Order, and Temporary Injunction against Sephora USA, Inc. ("Sephora") and respectfully shows as follows:

## I. SUMMARY

1. JCP and Sephora are Parties to an Amended and Restated Joint Enterprise Operating Agreement effective February 1, 2009 (the "Agreement"), which does not expire for several years. Seeking to circumvent the carefully-crafted dispute resolution process in the contract, Sephora has threatened to terminate the contract **_tomorrow_** and asserted that its "stores-within-a-store" portion of JCP's operations—JCP's only exclusive beauty offering— will not open when JCP re-opens stores later this week, unless JCP agrees to shorten the contract term.

2. Sephora has no basis to assert a knife-edge termination or demand a premature end to the Parties' contract. Terminating a key contract that JCP has depended on for over a

decade, while JCP intends to reopen 9 stores this week, would cause irreparable harm.  Sephora

knows this, and its threats to terminate the Agreement ***immediately*** are transparent efforts to

gain negotiating leverage where Sephora has none.  Thus, JCP seeks a declaration that Sephora

has no right to terminate the contract, and asks the Court for a temporary restraining order

barring Sephora from doing so.

## II.   THE PARTIES

3.      JCP is a Delaware Corporation with its headquarters in Plano, Texas.

4.      Sephora is a Delaware corporation with its primary place of business in San

Francisco, California.  Sephora and JCP are sometimes referred to hereinafter jointly as the

"Parties" or individually as a "Party."

## III.   CLAIM FOR RELIEF & DISCOVERY LEVEL

5.      Pursuant to Texas Rule of Civil Procedure 47, the value of the Agreement at

issue exceeds $1 million and JCP seeks non-monetary injunctive relief.

6.      JCP intends to conduct discovery under Level 3 of the Texas Rules of Civil

Procedure.

## IV.   JURISDICTION & VENUE

7.      This Court has subject-matter jurisdiction to hear and determine JCP's writ of

injunction pursuant to Section 65.021(a) of the Texas Civil Practice and Remedies Code. This

Court also has subject matter-jurisdiction over this action because the amount in controversy

exceeds this Court's minimum jurisdictional requirements.

8.      This Court has personal jurisdiction over Sephora because it has purposefully

availed itself of the privileges and benefits of conducting business in Texas.  Among other

things, JCP's claims relate to and arise from Sephora's forum contacts, specifically the

Agreement, which the Parties negotiated, formed, and performed in Texas, and the Parties' ongoing business relationship involving business in Texas.  Jurisdiction is also proper under the Texas long-arm statute because Sephora is "doing business" in Texas by contracting with a Texas resident and performing that contract in whole or in part in Texas.  Moreover, this Court's exercise of jurisdiction over Sephora will not offend traditional notions of fair place and substantial justice and is consistent with due process.

9.      Venue is proper pursuant to Section 15.002(a)(1) of the Texas Civil Practice and Remedies Code because all or a substantial part of the events giving rise to JCP's claims arose in Collin County, Texas.  Venue is also proper pursuant to Section 15.002(a)(4) of the Texas Civil Practice and Remedies Code because JCP's headquarters is located in Collin County.

## V.   <u>RELIEF REQUESTED</u>

10.     JCP requests that the Court enter a temporary restraining order preventing Sephora from attempting to terminate the Parties' Agreement without basis and in violation of the Parties' agreed dispute resolution process.  Sephora has threatened to unilaterally terminate the Parties' Agreement *tomorrow* unless JCP agrees to release Sephora from the terms of that Agreement long before its natural end.  Sephora has no right to demand an early exit from the Parties' contract, and termination by Sephora tomorrow would cause immediate and irreparable harm to JCP—which depends on Sephora as its only beauty partner and could not obtain a new beauty partner without reasonable lead time.  JCP intends to reopen 9 of its stores this week, and Sephora has no legal basis to terminate the contract in the midst of that reopening.

11.     While granting a temporary restraining order will prevent immediate and irreparable harm to JCP, it will not harm Sephora.  All JCP is asking for is for this Court to maintain the contractual status quo in which the Parties' agreed contractual dispute resolution

process will play itself out. Sephora has not even attempted to follow that process; instead, it is trying to end-run the process by unilaterally ending the Parties' 16-year relationship in the middle of a pandemic. Allowing Sephora to proceed with this extra-contractual "self-help" would cause JCP immediate and irreparable harm. By contrast, while JCP intends to reopen the first 9 of its own stores this coming week, Sephora has announced that it does not intend to reopen any of its stand-alone stores until at least May 22. Accordingly, Sephora will not suffer any harm whatsoever from the relief requested by JCP, which simply requires it to honor its contractual obligations and make no effort to terminate the Agreement for 14 (or 28) days.

## VI. FACTUAL BACKGROUND

### A. The Parties' Relationship

12. JCP is a well-known department store that has been operating for more than a century and is headquartered in Plano, Texas. JCP currently operates approximately 850 locations across 49 states, employs nearly 90,000 associates, and administers a massive supply chain network with approximately 2,800 vendors and 11 domestic shipping facilities.

13. Sephora is a California-based subsidiary of a French beauty company that operates over 2,600 stores worldwide. Sephora operates its own, stand-alone stores throughout the United States, several of which are in Collin County. In addition, Sephora has partnered with JCP to create "stores-inside-a-store" where Sephora products are sold inside JCP locations.

14. Specifically, in approximately 2006, JCP and Sephora began a relationship in which Sephora would place stores "inside" JCP locations, containing an exclusive beauty offering which would benefit both Parties. A photo of one of these locations, known between the Parties as SiJCP (for "Sephora inside J. C. Penney") is copied below:



15.     Today, there are Sephora locations in over 600 JCP stores across the country,
including numerous across Texas.  These locations use a smaller footprint than stand-alone
Sephora stores and, as shown in the photos above and below, are generally located in prominent
locations in each of JCP's stores, such as the entrance or the center of the store:





16.      In those JCP locations that contain SiJCP, Sephora is (with limited exceptions) the exclusive source of beauty offerings within the JCP store, featuring products from more than 200 beauty brands.  Sephora's own collection of products, tools and accessories are also featured in SiJCP locations, as well as JCP's online e-commerce website.  In addition, SiJCP locations inside JCP stores include "the Beauty Studio," where customers can partake in one-on-one beauty sessions with specialists.

**B.  The Parties' Agreement**

17.      JCP and Sephora are Parties to the Agreement, which became effective February 1, 2009.  *See* Ex. A.[1]  The current term of the Agreement lasts several more years.

18.      Under the terms of the Agreement, the Parties have opened a large number of SiJCP locations.  *See id.* § 1.1.  The Parties have established an "Operating Committee,"

---

[1] JCP has attached a copy of the Agreement redacted to remove irrelevant but non-public terms. JCP is happy to provide the Court an unredacted version, should the Court request it.

comprised of personnel from both companies, to "determine overall policies, objectives, procedures, methods and actions" under the Agreement. *Id.* § 2.1. Certain matters are assigned to the Operating Committee, including establishment and oversight of an annual operating plan and budget for the SiJCP business, *id.* § 2.3, "Beauty Installation design, location and environment," *id.* § 2.4(a), promotions and marketing plans, *id.* § 2.4(d) training programs, *id.* § 2.4(j), overhead needs, § 2.4(m), preparing financial and operating reports, § 2.4(o), and negotiating with third party vendors, § 2.4(r). Certain matters are directed to specific Parties, for example, "[e]mployment of Beauty Installation Associates, for which JCP, with limited input and advice from Sephora, shall control employment decisions, including selection, compensation, employment, discipline and termination." *See id.* § 2.4(i). But otherwise, SiJCP is a partnership in which the Parties work together to create and maintain standards for the operation of Sephora stores within JCP locations.

19.     The Agreement contains a comprehensive dispute resolution provision in the event that there are serious disagreements between the Parties. Pursuant to this dispute resolution provision, Operating Committee meetings can be called upon five days' notice (or 48 hours in an emergency). Ex. A, § 2.2(b). If there is a matter upon which the Operating Committee is contractually directed to make a joint decision, and there is sufficient disagreement such that a decision cannot be made, then the Operating Committee can be declared (or deemed) to be in "Deadlock," and "***no action shall be taken as to such matter, and no change in the exercise of rights or in the performance of obligations by any of JCP or Sephora as to such matter shall be made while the decision is subject to the Deadlock.***" *Id.* § 2.2(c) (emphasis added). If a Party believes that the issue in "Deadlock" is material, then that Party may refer the matter to a senior operating committee of the Parties' CEOs (the

"Senior Operating Committee").  *Id.*  Referral of the matter to the Senior Operating Committee has to occur by "written notice from one party to the other."  *Id.*  "If neither JCP or Sephora formally refers the Deadlock to the Senior Operating Committee, the matter shall remain unresolved and ***the status quo will be maintained until such time as the Deadlock is resolved or the parties otherwise agree to abandon the deadlock***."  *Id.* (emphasis added).

20.     The Parties' contractual dispute resolution process does not end with referral to the Senior Operating Committee.  Instead, the Agreement provides that the Senior Operating Committee "shall engage in good faith negotiations in an attempt to resolve any Deadlock."  *Id.* § 2.2(d).  If the Committee is unable to reach an agreement after such good faith negotiations are complete, then one Party must give notice to the other that there has been a failure, after which the other Party may elect "to proceed to binding [AAA] arbitration, subject to the termination rights set forth in Section 2.2(e)" of the Agreement.  A Party may obtain the right to terminate based on one of these disputes only by pursing this process to its end and obtaining a decision by an arbitration panel.  *Id.*

21.     In other words, under the terms of the Agreement, ***no matters referred to the Operating Committee or the Senior Operating Committee*** give rise to a right to terminate until and unless (1) the matter has been properly referred to the Senior Operating Committee, (2) there has been a formal impasse declared, (3) a Party dissatisfied with the results of the impasse brings the matter to arbitration, (4) an AAA arbitration occurs, and (5) an arbitration panel actually makes a decision.  *See id.* §§ 2.2(e), 9.1(e).  And if a Party decides to terminate following the decision of the arbitration panel, the Agreement is clear that the terminating Party "shall pay an additional amount to the other party equal to fifty percent (50%) of the terminating party's Operating Profit as reflected on the Profit and Loss Report for the last completed fiscal

year." *Id.* § 2.2(e).

22.     In sum, the Parties' Agreement requires this deliberate process to be followed before either Party can declare a termination based upon operational disputes.  This process is intentional and has an obvious rationale.  The Parties agreed to a long-term relationship, which originally was 10 years and has been extended by amendment to last even longer.  That relationship is significant, as reflected in the fact that more than 600 JCP locations contain SiJCPs, and within those JCP locations, SiJCPs are "the exclusive source of Beauty Offerings within such JCP store" with some limited exceptions specified in the Agreement.  *Id.* § 4.2(a)(i). Separating SiJCP from JCP would require time, thought, and deliberation, and the Parties agreed that operational disputes would not create a right to terminate the Agreement until and unless the deliberate process within the Agreement was followed.

23.     Finally—and importantly—the Parties also specifically agreed and acknowledged the right of either to enforce compliance with the terms of the Agreement through interim injunctive relief in court if such "interim relief is necessary to prevent serious and irreparable injury to one of the parties." *Id.* § 2.2(d).

### C. <u>The Parties' Disagreements</u>

24.     The Parties have had several disagreements of late, but none gives Sephora any right to terminate the Agreement, particularly on a knife-edge basis as Sephora has threatened to do ***tomorrow*** unless JCP agrees to its demand to terminate the Agreement early.

25.     *First*, in March 2020, JCP made the difficult decision to temporarily close its stores to protect the health and safety of its associates (and the public) due to the COVID-19 pandemic.  Sephora made the same decision with respect to its stand-alone stores.

26.     Following this decision, the Parties had a disagreement related to JCP's decision

to furlough associates at the closed JCP stores, which included associates working at SiJCP locations.   JCP made this decision so that the associates could apply for and collect unemployment insurance while still staying on JCP's benefit plans and receiving health care coverage subsidized by JCP.   While JCP believed this was the right thing to do for both the company and its associates, Sephora expressed dissatisfaction with the decision, asserting in email correspondence and other documents that "JCP has breached the Agreement" through its decision "to 'furlough' the Beauty Installation employees…." Ex. B; Ex. C.

27.     But Sephora's dissatisfaction is of no moment under the Agreement: JCP has exclusive authority over employment decisions, such as the decision to furlough employees. *See* Ex. A, § 2.4(i) ("Employment of Beauty Installation Associates, for which **JCP**, with limited input and advice from Sephora, ***shall control employment decisions***, including selection, compensation, employment, discipline and termination.") (emphasis added).   While Sephora and JCP (including their CEOs) have discussed this decision, *e.g.*, Exs. B-C, Sephora has not formally declared the matter to be in deadlock, let alone initiated the arbitration process, after which either side would have the ability to terminate the Agreement.

28.     *Second*, last week, starting on Thursday, April 23, 2020, Sephora began demanding that when JCP reopens (likely) 9 stores later this week, JCP is required to use a specific, electrostatic spray for hard surfaces within SiJCP locations that is not part of the "Hygiene Standards" that the Parties had previously agreed upon.

29.     JCP disagrees that such a spray is necessary.   So too does the Centers for Disease Control and Prevention ("CDC").   Sephora's demanded electrostatic spray is not recommended by the CDC; nor is there even reference to it on the coronavirus.gov or cdc.gov websites.   JCP is following CDC guidelines and recommendations and taking the necessary and important

precautions to protect its associates and customers.  And, importantly, in doing so, JCP continues to adhere to the Hygiene Standards that the Parties had agreed upon.  Under Section 7.3 of the Agreement, SiJCP business is to be conducted "in substantial accordance with the standards and practices of Sephora retail stores." JCP is complying with and will continue to comply with this provision.  A single difference in pre-daily opening cleaning procedures would not mean that JCP is operating in a manner outside the "substantial accordance" required by Section 7.3.  Further, as described above, stand-alone Sephora stores are not open at all, and Sephora does not plan to open any stand-alone stores until May 22—meaning that Sephora has not yet implemented this new cleaning policy into any store and cannot seek to impose it upon JCP at this time or use it as a basis for terminating the Agreement.

30.     Regardless, *even if* Sephora had good faith bases to challenge JCP's decision on these issues, neither gives Sephora a right to terminate the Parties' Agreement.  None of these issues could plausibly be deemed breaches of the Agreement, let alone material breaches. Moreover, Sephora has not taken the relevant procedural steps that are predicates to seeking termination.  This includes failing to formally declare a "Deadlock" with respect to any of the issues, invoking the Parties' contractual arbitration clause, and securing an arbitration decision from a properly-appointed AAA panel that would give any Party a right to terminate.

### D.  Sephora's Termination Threats

31.     On April 14, 2020, Sephora suggested that it was interested in negotiating with JCP to end the term of the Agreement prior to its natural termination.  JCP advised Sephora that it was willing to engage in a negotiation to that end, provided that the timing and process for any wind-down made sense for JCP.

32.     Thereafter, on Friday, April 24, 2020, Sephora made an explicit threat:  if JCP

did not agree to shorten the term of the Agreement so that it ended in April 2021, then Sephora would terminate the Agreement on Tuesday, April 28, 2020.  Sephora further threatened that, unless JCP agreed to its demanded terms, then:

- Sephora would not be part of JCP's business when JCP stores re-open later this week;

- None of Sephora's brands would ship product to JCP;

- Sephora would refuse to launch new products at SiJCP locations; and

- Sephora would refuse to launch at SiJCP locations an exclusive brand that the Parties had already agreed would be brought to SiJCP locations this summer.

Sephora advised JCP that, unless JCP succumbed to its threats, the Parties' 16 year relationship would suddenly be terminated on April 28, 2020—*tomorrow*—and that Sephora would not be a part of JCP's reopening later this week.

33.     JCP has no alternative to the 16-year relationship it has built with Sephora and cannot replace Sephora—its sole beauty partner—on a prompt basis if Sephora follows through with its threat to immediately terminate the Parties' relationship and the Agreement tomorrow, April 28, 2020.

## VII.  CONDITIONS PRECEDENT

34.     All conditions precedent to JCP's claims for relief have been performed, have occurred, and/or are excused or waived.

## VIII.  CAUSES OF ACTION

### A. DECLARATORY JUDGMENT

35.     JCP incorporates herein by reference the allegations set forth in the preceding paragraphs.

36.     The Texas Uniform Declaratory Judgment Act, Tex. Civ. Prac. & Rem. Code

Ann. § 37.004(a) reads in relevant part: "A person interested under a deed, will, written contract, or other writings constituting a contract or whose rights, status, or other legal relations are affected by a statute, municipal ordinance, contract, or franchise may have determined any question of construction or validity arising under the instrument, statute, ordinance, contract, or franchise and obtain a declaration of rights, status, or other legal relations thereunder." TEX. CIV. PRAC. & REM. CODE ANN. § 37.004; *see also* TEX. CIV. PRAC. & REM. CODE ANN. § 37.003(a) ("A court of record within its jurisdiction has power to declare rights, status, and other legal relations whether or not further relief is or could be claimed….").   Under this provision**,** "any person interested under a written contract may have determined any question of construction or validity arising under that contract and obtain a declaration of rights, status, or other legal relations thereunder." *Transp. Ins. Co. v. WH Cleaners, Inc.*, 372 S.W.3d 223, 228 (Tex. App.—Dallas 2012, no pet.) (quoting Tex. Civ. Prac. & Rem. Code Ann. § 37.004(a)); *see also Trinity Universal Ins. Co. v. Sweatt,* 978 S.W.2d 267, 270 (Tex. App.—Fort Worth 1998, no. pet.) ("Construction and validity of contracts are the most obvious and common uses of the declaratory judgment action.").

37.    This Court has the power to declare the rights, status, and legal relations between JCP and Sephora for the purposes of injunctive relief.  JCP has not breached the Agreement at all, let alone "materially" so, and Sephora has not given JCP written notice of breach or an opportunity to cure.  Further, the agreed-to dispute resolution process established under Section 2.2 of the Agreement has not been pursued, let alone reached conclusion, such that termination is possible.  By any measure, Sephora has no right to terminate the contract.

38.    Regarding the furloughing of employees, Section 2.4(i) of the Agreement provides that "**JCP, *with limited input and advice from Sephora*, shall control employment**

**decisions**, including selection, compensation, employment, discipline and termination." Ex. A, § 2.4(i) (emphases added).  Further, Section 12.2 of the Agreement reiterates JCP's control over employees, including "Beauty Installation Associates," providing that "***JCP shall maintain complete control over its employees including Beauty Installation Associates, its agents and its subcontractors with respect to performance of the Operations***."  *Id.* § 12.2. Thus, Sephora has no plausible basis to assert a breach based on JCP's decision to furlough employees.

39.     Regarding JCP's plans to clean its stores upon reopening this week, JCP is certainly in substantial compliance with both the Parties' agreed-upon procedures and those that are used in open Sephora stand-alone stores.  Indeed, JCP plans to follow the agreed-upon procedures that the Parties' Operating Committee has put in place.  While Sephora has claimed that it intends to implement additional procedures when it opens on May 22, 2020, no such procedures are in place today (given that Sephora's stores are not open).

40.     In any event, Sephora has no basis to assert any of this as a basis for termination based on alleged breach of contract on Tuesday, April 28, 2020, because (a) there has been no written notice of material breach; and (b) the 30-day cure period has not been triggered, let alone passed.

41.     Furthermore, the Agreement provides a contractual process for resolving operational-related disputes that could potentially lead to termination at the end of the process. *See* Ex. A, § 2.4(e).  But that process has not even begun, as none of the procedures laid out in Sections 2.2(d) and 2.2(e) have occurred:

- The Operating Committee has not sent formal notice to the Senior Operating Committee of a Deadlock;

- The Senior Operating Committee has not completed good faith negotiations to resolve a Deadlock;

- The Senior Operating Committee has not formally reached a Deadlock;

- No Party has provided formal notice to the other Party that the former wishes to engage in arbitration;

- Arbitration has not occurred; and

- No arbitration decision has been made.

42.     In any event, a genuine case and controversy exists between JCP and Sephora, within the jurisdiction of this Court, and involving rights, status, and other legal relations of the Parties. *See* Tex. Civ. Prac. & Rem. Code §37.002(b).

43.     Pursuant to the Uniform Declaratory Judgment Act, JCP seeks a declaration from the Court that Sephora has no right to declare a termination of the Agreement.

44.     Further, pursuant to Texas Civil Practice and Remedies Code §37.009, JCP is entitled to recover its reasonable attorneys' fees and costs. JCP has retained the undersigned attorneys and agreed to pay their reasonable and necessary attorneys' fees.

## IX.  REQUEST FOR TEMPORARY RESTRAINING ORDER

45.     JCP incorporates herein by reference the allegations set forth in the preceding paragraphs.

46.     The allegations set forth in this application for restraining order are supported by the verifications of these allegations by JCP's Executive Vice President and Chief Merchant, Michelle Wlazlo, and the Agreement attached hereto.

47.     Under Texas law, an application for a temporary restraining order must plead "(1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim." *Butnaru v. Ford Motor Co.*, 84

S.W.3d 198, 204 (Tex. 2002). "The applicant is not required to establish that it ultimately will prevail at trial, only that it is entitled to preservation of the status quo pending trial on the merits." *Sargeant v. Al Saleh*, 512 S.W.3d 399, 409 (Tex. App.—Corpus Christi 2016, no pet.). And the parties have specifically agreed that interim injunctive relief is available to enforce the terms of the agreement where (as here) such "interim relief is necessary to prevent serious and irreparable injury to one of the parties." Ex. A, § 2.2(d).

48.     Termination of the Agreement tomorrow as threatened by Sephora would leave JCP without a stand-alone beauty offering for its customers. JCP would immediately lose the ability to (i) sell customers (with very limited exception) beauty offerings in JCP stores with SiJCP locations; (ii) provide customers one-on-one beauty sessions with specialists; and (iii) market beauty offerings, including exclusive offerings, such as the specific, exclusive brand that the Parties had agreed would be brought to SiJCP, all of which contribute to JCP's ability to attract more customers and further build its brand and reputation for selling highly desired beauty offerings.  Indeed, customers across the country who come to JCP, or shop on its website, expecting to purchase Sephora products would be unable to, because Sephora has asserted that (unless JCP accedes to Sephora's demands) it will not be part of JCP's business when JCP stores re-open later this week and will stop shipping Sephora products to JCP stores. JCP cannot quantify the number of actual and potential customers that it would lose as a result of Sephora's conduct.

49.     JCP has no other beauty partner to fill the void that would be caused by Sephora's tactics.  And to make matters worse, JCP is currently not permitted to engage with other potential partners who might be long-term replacements for Sephora because of the terms of the Agreement, and it would take some time to replace Sephora even if JCP was permitted

to do so.

50.    Accordingly, in the interim, and beginning immediately, if Sephora terminated the Agreement, JCP would suffer irreparable harm, including the disruption of its business, the loss of clientele, and the loss of goodwill.  It would be difficult if not impossible to calculate the damages of a knife-edge termination of the Agreement, and the damage done would not be sufficiently captured by monetary damages awarded against Sephora after-the-fact.

51.    JCP is thus entitled to a temporary restraining order and other equitable relief pursuant to Texas law, including without limitation under subsections (1), (2), and (3) of section 65.011 of the Texas Civil Practice and Remedies Code.

52.    As set forth in detail above and below, JCP has established by this verified petition: (1) a cause of action against Sephora; (2) probable right to relief, and (3) a probable, imminent, and irreparable injury in the interim.  Furthermore, a temporary restraining order should be granted pursuant to Texas Rule of Civil Procedure 680 because this verified petition shows by specific facts that immediate and irreparable injury, loss, or damage will result to JCP before notice can be served and a hearing had hereon.

53.    As detailed above, there is no question that Sephora imminently intends to breach its Agreement with JCP by declaring a termination without basis and without pursuing the dispute resolution that is explicitly called for by the Agreement.   JCP has therefore established, at the very least, a cause of action against Sephora and probable right to the relief.

54.    Without the Court's intervention, JCP will suffer imminent, irreparable harm for which there is no adequate remedy at law. This includes: (i) disruption of JCP's business operations, and (ii) loss of goodwill, clientele, marketing techniques, office stability and the like. The full extent of these harms is difficult—if not impossible—to fully assess.  *E.g.*,

*Intercontinental Terminals Co., LLC v. Vopak N. Am., Inc.*, 354 S.W.3d 887, 895 (Tex. App.—Houston [1st Dist.] 2011, no pet.) ("Threatened injury to a business's reputation and good will with customers is frequently the basis for temporary injunctive relief.") (collecting cases); *Frequent Flyer Depot, Inc. v. Am. Airlines, Inc.,* 281 S.W.3d 215, 228 (Tex. App.—Fort Worth 2009) ("Disruption to a business can be irreparable harm. Moreover, assigning a dollar amount to such intangibles as a company's loss of clientele, goodwill, marketing techniques, and office stability, among others, is not easy."); *Tex. Dep't of State Health Services v. Holmes*, 294 S.W.3d 328, 334 (Tex. App.—Austin 2009, pet. denied) ("Irreparable harm for purposes of a temporary injunction may include noncompensable injuries such as a company's loss of goodwill, clientele, marketing techniques, office stability and the like.").

55.    It is thus settled law in Texas that these sorts of injuries are the "very type of harm for which a temporary injunction can issue." *Liberty Mut. Ins. Co. v. Mustang Tractor & Equip. Co*., 812 S.W.2d 663, 666 (Tex. App.—Houston [14th Dist.] 1991, no writ); *see also Intercontinental Terminals Co.*, 354 S.W.3d at 893–96 (affirming trial court's conclusion that company's restriction on railway track would cause customer uncertainty, delay in servicing customers, backlog costs, and demurrage fees that would be very difficult to calculate).  That is because "the irreparable injury requirement is satisfied when injuries of this nature are difficult to calculate or monetize." *Id.* (collecting cases); *see also Regal Entm't Grp. v. iPic-Gold Class Entm't, LLC*, 507 S.W.3d 337, 356 (Tex. App.—Houston [1st Dist.] 2016, no pet.) (affirming TRO because trial court "could have concluded that at least some of the harm that iPic would suffer was reputational—an injury to its goodwill—and irreparable"); *Frequent Flyer Depot*, 281 S.W.3d at 228 (affirming TRO prohibiting sale of airline rewards points pending trial on contract claims based on irreparable harm finding that sale of airline points

"affects the reputation and loyalty" of airline's customers); *Townson v. Liming*, No. 06–10–00027–CV, 2010 WL 2767984, at *3 (Tex.App.—Texarkana July 14, 2010, no pet.) ("The value of lost patients, lost business contacts and collaborations, and lost hospital privileges are anything but fixed, settled, and indisputable. Rather, by their very nature, it is likely that [plaintiff] might never even be aware of specific patients and business contacts lost.").

56.     Maintaining the contractual status quo will prevent this irreparable harm. Here, the last peaceable, non-contested status between the parties is their ordinary operation under the Agreement. *Universal Health Services, Inc. v. Thompson* is illustrative. 24 S.W.3d 570 (Tex. App.—Austin 2000, no pet.). There, the court's injunction prohibited a hospital from closing—thus maintaining the status quo—"by ordering that operations continue as they existed *prior* to the Investors' attempt to close the hospital." *Thompson*, 24 S.W.3d at 577; *see also Hartwell v. Lone Star, PCA*, 528 S.W.3d 750, 767 (Tex. App.—Texarkana 2017, pet. dism'd) (maintaining status quo by preserving rights under agreement). So too here. Injunctive relief is necessary to preserve the parties' contractual status quo and prevent Sephora from terminating the contract outside of the parties' agreed dispute resolution process.

57.     JCP is willing to post a bond if the Court deems it necessary and appropriate.

58.     For all these reasons, pursuant to Texas Rule of Civil Procedure 680 *et seq.* and Texas Civil Practice and Remedies Code § 65.001 *et seq.*, and to preserve the status quo during the pendency of this action, JCP respectfully requests a temporary restraining order immediately restraining Sephora, including its officers, agents, servants, employees, attorneys, and all other persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise (collectively, the "Restrained Parties") from threatening to, attempting to, or purporting to, terminate the Agreement.

59.     Further, in light of the on-going State of Disaster and existing shelter-in-place and similar orders extending through approximately mid-May 2020, JCP respectfully requests that the Court extend the temporary restraining order to May 25, 2020. The Court unquestionably has the authority to do so pursuant to the Texas Supreme Court's *First Emergency Order Regarding the COVID-19 State of Disaster*, which provides that this Court may "[m]odify or suspend any and all deadlines and procedures, whether prescribed by statute, rule, or order, for a stated period ending no later than 30 days after the Governor's state of disaster has been lifted."  Even absent this authority, the Court may extend the temporary restraining order for up to an additional fourteen days under Rule 680 of the Texas Rules of Civil Procedure for good cause. Good cause undoubtedly exists here in light of the serious health risks caused by COVID-19, the declared State of Disaster, and shelter-in-place orders, all of which will impact and limit the Parties' abilities to gather witnesses and evidence for the temporary injunction hearing.

60.     Finally, compliance with Local Rule 2.4(a) is not required because Local Rule 2.4(b)(2) applies.  As described above, the temporary restraining order JCP seeks is to prevent Sephora from threatening to, attempting to, or purporting to, terminate the Agreement. Providing Sephora two hours' notice of this application would provide it the ability to do precisely that.  As such, any such notice "would impair or annul the Court's power to grant relief because the subject matter of the application could be compromised…if notice were given." L.R. 2.4(b)(2).

## X. <u>REQUEST FOR TEMPORARY INJUNCTION</u>

61.     JCP incorporates herein by reference the allegations in the preceding paragraphs. JCP respectfully asks the Court to set its application for temporary injunction for a

hearing and, after the hearing, issue a temporary injunction against Sephora. JCP has joined all

indispensable parties under the Texas Rules of Civil Procedure.

## XI.  ATTORNEYS' FEES

62.     JCP incorporates herein by reference the allegations set forth in the preceding

paragraphs. Pursuant to Texas Civil Practice and Remedies Code § 38.001 and the Uniform

Declaratory Judgment Act, JCP is entitled to and hereby requests its attorneys' fees.

## XII.  CONCLUSION & PRAYER

For these reasons, Plaintiff J. C. Penney Corporation, Inc. respectfully requests that

Defendant Sephora USA, Inc. be cited to appear and answer herein, and that: (i) JCP be awarded

temporary injunctive relief to prevent irreparable injury; (ii) JCP be awarded declaratory relief;

(iii) JCP be awarded its attorneys' fees; and (iv) for other relief to which JCP is entitled.

Dated: April 27, 2020.                          Respectfully submitted,

*/s/  Jeremy A. Fielding*
Jeremy A. Fielding
Texas Bar No. 24040895
jeremy.fielding@kirkland.com
Michael Kalis
Texas Bar No. 24092606
michael.kalis@kirkland.com
KIRKLAND & ELLIS LLP
1601 Elm Street
Dallas, Texas 75201
(214) 972-1770
**ATTORNEYS FOR PLAINTIFF J. C.
PENNEY CORPORATION, INC.**

## CERTIFICATE PURSUANT TO L.R. 2.4

Pursuant to L.R. 2.4(b)(2), the undersigned counsel hereby certifies that notice to the
opposing party or counsel would impair or annul the Court's power to grant relief because the
subject matter of the application could be compromised, if notice were given.

*/s/ Jeremy A. Fielding*
Jeremy A. Fielding

CAUSE NO. _____

| | | |
|---|---|---|
| J. C. PENNEY CORPORATION, INC., | § | IN THE DISTRICT COURT OF |
| Plaintiff, | § | |
| v. | § | COLLIN COUNTY, TEXAS |
| SEPHORA USA, INC., | § | |
| Defendant. | § | _____ JUDICIAL DISTRICT |

## VERIFICATION/DECLARATION OF MICHELLE WLAZLO

I, Michelle Wlazlo, hereby declare:

1.      I am the Executive Vice President and Chief Merchant of J. C. Penney Corporation, Inc. ("JCP") and have held that position since March 1, 2019. I am over twenty-one years of age and of sound mind. I have never been convicted of a crime. I am competent to testify and have personal knowledge of the facts stated in JCP's Verified Original Petition, Application for Declaratory Judgment, Temporary Restraining Order, and Temporary Injunction (the "Petition").

2.      I have read the Petition. The facts stated in paragraphs 1-4, 8, 12-17, 24-33, 41, and 48-50 are true and correct.

3.      Attached as Exhibit A to the Petition is a true and correct copy of the Amended and Restated Joint Enterprise Operating Agreement, as amended, between JCP and Sephora USA, Inc.

My name is Michelle Wlazlo, my date of birth is July 20, 1967, and my business address is 6501 Legacy Drive, Plano, TX  75024. I declare under penalty of perjury that the foregoing is true and correct.

Executed in Collin County, TX, on the 27th of April, 2020.

_____
Michelle Wlazlo